## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| **W.W. GRAINGER, INC., W.W. GRAINGER INC. GROUP BENEFIT PLAN I; W.W. GRAINGER INC. GROUP BENEFIT PLAN II; AND W.W. GRAINGER INC. GROUP BENEFIT PLAN III,**<br><br>    **Plaintiffs,**<br><br>  **v.**<br><br>**AETNA LIFE INSURANCE COMPANY,**<br><br>    **Defendant.** | **Case No.** _____ |

## COMPLAINT

Plaintiffs W.W. Grainger, Inc.; W.W. Grainger, Inc. Group Benefit Plan I; W.W. Grainger, Inc. Group Benefit Plan II; and W.W. Grainger, Inc. Group Benefit Plan III (collectively, "Grainger" or "Plaintiffs"), through their undersigned counsel, submit this Complaint against Defendant Aetna Life Insurance Company ("Aetna" or "Defendant"), and allege as follows:

## PRELIMINARY STATEMENT

1.      Grainger is a broad line distributor of maintenance, repair, and operating products serving more than 4.5 million customers worldwide.  In 2019, Grainger hired Aetna to administer the W.W. Grainger, Inc. Group Benefit Plan I, W.W. Grainger, Inc. Group Benefit Plan II, and W.W. Grainger, Inc. Group Benefit Plan III (the "Plans") covering Grainger's more than twenty thousand employees along with their family members ("Plan Participants").  The Plans are organized and operated under the Employee Retirement Income Security Act of 1974 ("ERISA").

2.      In its role as a third-party administrator ("TPA") of the Plans, Aetna had contractual and statutory obligations to prevent fraud, waste, and abuse in connection with the more than one hundred and fifty million dollars in claims for health benefits submitted to the Plans for payment. Aetna leveraged its role as one of the TPAs of the Plans to enrich itself to Grainger's detriment. Aetna's failure to perform its most basic obligations cost Grainger millions and millions of dollars.

3.      Grainger paid Aetna a fee for adjudicating health care providers' claims for payments for the care and treatment of Plan Participants.  Claims were paid using Grainger's contributions to the Plans in addition to any employee contributions.  Aetna served as the middleman between the Plans and the health care providers by deciding which claims should be paid and how much each Plan should pay for each claim.  Aetna did not act as an insurer or bear

risk in this role.  Since 2019, Grainger has sent more than $153 million to Aetna to pay for medical services rendered to Plan Participants.

4.      Aetna committed to pay properly adjudicated claims from the Plans' accounts through duly granted authority, as ERISA requires.  Aetna should have preserved the Plans' assets for the benefit of the Plan Participants and only used those assets to pay legitimate claims for health benefits.  Aetna had a fiduciary duty and a contractual obligation to investigate and deny payment of fraudulent, false, or improper claims.  Aetna owed Grainger an affirmative fiduciary duty under ERISA to exercise "care, skill, prudence and diligence" in identifying and denying fraudulent, improper, or otherwise illegitimate claims.

5.      In practice, however, Aetna abused its authority to enrich itself to Grainger's detriment.  Aetna took money from Grainger under the guise of claims administration, transferred the money to accounts under Aetna's control, paid a fraction of that money to health care providers to settle the claims, and kept the difference.  In fact, Aetna did not use the fraud prevention techniques it regularly employs when administrating claims for its own fully insured plans.  Aetna never refunded or credited the difference to the Plans.

6.      As a result, Aetna was unjustly enriched—not only by avoiding the cost of fraud prevention, but also by requesting and receiving money from the Plans to pay for claims that should never have been paid in the first place.

7.      Aetna also engaged in active deception to conceal its breaches of its duties to the Plans.  Aetna prevented Grainger from discovering Aetna's improper conduct, including by limiting audit rights, providing false or inaccurate claims reports, and preventing Grainger from obtaining or accessing data about the actual financial transactions between Aetna and the health care providers.

8.      Grainger brings this action seeking equitable relief[1] for harm caused by Aetna's wrongful conduct and to prevent Aetna's unjust enrichment.

## PARTIES

9.      Plaintiff W.W. Grainger, Inc. is an Illinois corporation with its principal place of business at 100 Grainger Parkway, Lake Forest, Illinois.

10.     Plaintiff W.W. Grainger, Inc. is the principal funding source for the Plans, and is the duly and properly designated administrator and fiduciary of the Plans.

11.     Plaintiffs W.W. Grainger, Inc. Group Benefit Plan I, W.W. Grainger, Inc. Group Benefit Plan II, and W.W. Grainger, Inc. Group Benefit Plan III are welfare benefit plans organized and operated under ERISA.

12.     Defendant Aetna Life Insurance Company is a Connecticut corporation with its principal place of business at 151 Farmington Road, Hartford, Connecticut.

## JURISDICTION AND VENUE

13.     Pursuant to 29 U.S.C. § 1132(e) and 28 U.S.C. § 1331, this Court has jurisdiction over the claims asserted in this Complaint.

14.     The Court has personal jurisdiction over Aetna because, at all times relevant to the claims asserted herein, Aetna conducted business in the State of Texas within the meaning of the

---

[1]      The Agreement, as defined in ¶ 20, contains an arbitration clause that explicitly excludes "[a]ny controversy or claim" seeking "any [ ] form of equitable relief," such as ERISA claims seeking equitable relief, from the scope of any arbitration.  Agreement § 15.  Analyzing an identical arbitration clause, this Court has already held: (1) the plain language of the clause permits the Court to interpret threshold issues of arbitrability, and (2) monetary claims arising under ERISA §§ 1132(a)(2) and (a)(3) are equitable in nature and therefore not subject to mandatory arbitration. *See Aramark Services, Inc. et al. v. Aetna Life Ins. Co.*, 23-cv-00446-JRG (E.D. Tex. Apr. 26, 2024) (Dkt. 43 at 5, 7).

Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code § 17.  Aetna's contacts with the State of Texas include, but are not limited to:

a.   As early as 1909, Aetna has been registered with the Texas Department of Insurance to operate in Texas (including in this District).  The Texas Department of Insurance licensed Aetna to offer health insurance products in the State (and accident and life insurance and variable annuities).  Aetna has license number 400.  Since receiving its license, Aetna has operated continuously in the State of Texas;

b.   As of 2022, Aetna was the sixth largest insurer in the State with a market share of 4.73% and reported premium intake of $2,728,396,377.[2]  Neither the market share nor premium revenue include the market share or premiums of other companies that may be affiliated with Aetna;

c.   Aetna has multiple offices in the State of Texas and within this District;

d.   Aetna has contractual relationships with hundreds, if not thousands, of doctors, hospitals, and other health care providers that care for and treat patients in Texas and in this District, ranging in size from large hospital systems to single doctor practices (generally, those who render health care will be referred to as "providers");

e.   Aetna provides medical and dental insurance coverage to thousands of families and individuals who reside in Texas in the District;

f.   Aetna has contractual relationships with hundreds of employers and plan sponsors that are based in, operating in, have employees working in, or have employees residing in Texas in this District; and

g.   Aetna provides and has provided medical and dental coverage to Grainger employees and their families in Texas, and upon information and belief, in this District.

15.    By agreeing to contract, adjudicate, and transmit payment for medical treatment and dental care of Grainger employees, retirees, and beneficiaries residing in Texas, and for medical and dental care rendered in Texas, Aetna purposefully availed itself of the privilege of conducting business within Texas.

---

[2]    *See Top-40 List of Insurers in Texas*, TEX. DEP'T INS. (Apr. 3, 2024), https://www.tdi.texas.gov/company/top40.html.

16.     Aetna previously filed complaints and prosecuted claims in this District.  Aetna has previously been sued in this District and did not object to jurisdiction or venue.

17.     For the reasons stated above, venue is also proper in this District pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b)(2).

## BACKGROUND

18.     Grainger lacks the expertise to evaluate claims for payment submitted by doctors and hospitals that cared for Plan Participants—a process called claims adjudication.  Grainger contracted that responsibility to Aetna when Aetna became one of the Plans' TPAs in 2019. Grainger conducted a competitive request for proposal process.  During that process, Aetna made representations regarding its competence and expertise to Grainger employees responsible for deciding which of the bidding companies Grainger should hire as claim fiduciaries.  Grainger selected Aetna as one of the Plans' TPAs and fiduciaries because, *inter alia*, Aetna represented its expertise evaluating payment claims submitted by providers for adherence to the Plans' coverage and reimbursement policies and industry-standard coding guidelines dictated by the Centers for Medicare and Medicaid Services ("CMS") and the American Medical Association ("AMA"), among others.

19.     As a TPA, Aetna does not provide traditional medical insurance to Grainger employees or retirees.  Aetna did not pay medical expenses for participants of the Plans in exchange for premiums.  Rather, Grainger retained the financial risk of increased medical expenses among its beneficiaries and participants by funding the medical expenses incurred by the Plans' beneficiaries using funds allocated from Grainger for that purpose.  In other words, Grainger self-funded its employees' medical expenses (with contributions from employees).

20.    The January 1, 2019 Master Services Agreement No. 657542 (the "Agreement")[3]

identifies Aetna as a fiduciary:

> Aetna . . . will discharge [its] obligations under this Agreement with that level of reasonable care which a similarly situated services provider or plan administrator, respectively, would exercise under similar circumstances.  If the Customer delegates claim fiduciary duties to Aetna pursuant to the applicable schedule, *Aetna shall observe the standard of care and diligence required of a fiduciary under ERISA Section 404(a)(1)(B).*

Agreement § 3 (emphasis added).

> The Customer and Aetna agree that with respect to Section 503 of the Employee Retirement Income Security Act of 1974, as amended, or applicable state law as appropriate, Aetna will be the "appropriate named fiduciary" of the Plan for the purpose of reviewing denied claims under the Plan.  The Customer understands that the performance of fiduciary duties under ERISA, or applicable state law as appropriate, necessarily involves the exercise of discretion on Aetna's part in the determination and evaluation of facts and evidence presented in support of any claim or appeal.  Therefore, and to the extent not already implied as a matter of law, the *Customer hereby delegates to Aetna discretionary authority to determine entitlement to benefits under the applicable Plan documents for each claim received, including discretionary authority to determine and evaluate facts and evidence, and discretionary authority to construe the terms of the Plan.*

Medical Services Schedule to the Agreement § I (emphasis added).

21.    Aetna's decision-making authority under the Agreement went far beyond mere application and compliance with its own guidelines.  Because Aetna exercised discretionary authority and control over the management of the Plans and the disposition of the Plans' assets, in addition to being a named ERISA fiduciary, Aetna was also a functional fiduciary.

22.    As a fiduciary, Aetna agreed to provide "Claim Services" for the Plans. Specifically, and by way of example, Aetna agreed to "process claims for Plan benefits . . . using Aetna's normal claim determination, payment, and audit procedures and applicable cost control

---

[3] A copy of the electronically executed Agreement is attached as Exhibit A to this Complaint.

standards in a manner consistent with the terms of the Plan(s), any applicable provider contract, and the Agreement."

23.    As a fiduciary, Aetna agreed to be responsible for processing and reviewing claims for health benefits by Plan Participants, including: (i) the eligibility of each claimant under the terms of the Plan, and (ii) the eligibility of the claim for health benefits under the terms of the Plan.

24.    As a fiduciary, Aetna agreed to be responsible for the approval and payment of only those claims that are legitimate, *i.e.*, not those that are fraudulent or otherwise improper and otherwise failed to satisfy the requirements of the Plans.  All other claims for payment were required to be denied.  The Agreement provides:

> Aetna shall provide Plan Participants with access to Aetna's network hospitals, physicians and other health care providers ("Network Providers") who have agreed to provide services at agreed upon rates and who are participating in the applicable Aetna network covering the Plan Participants. . . .  Contracted rates with Network Providers may be based on fee-for-service rates, case rates, per diems and in some circumstances, include performance-based contract arrangements, risk-adjustment mechanisms, quality incentives, pay-for-performance and other incentive and adjustment mechanisms.

General Administration Schedule to the Agreement §§ 4(a), (b).

25.    Aetna likewise exercised discretion with respect to recovery of overpayments on medical claims.  As a fiduciary, Aetna had an affirmative obligation to seek recovery of any fraudulent, illegitimate, or erroneous payments Aetna made on the Plans' behalf:

> Aetna shall reprocess any identified errors in Plan benefit payments (other than errors Aetna reasonably determines to be *de minimis*) and seek to recover any resulting overpayment by attempting to contact the party receiving the overpayment twice by letter, phone, or email.  The Customer may direct Aetna not to seek recovery of overpayments from Plan Participants, in which event Aetna will have no further responsibility with respect to those overpayments.  The Customer shall reasonably cooperate with Aetna in recovering all overpayments of Plan benefits. . . .  The Customer may not seek recovery of overpayments from network providers, but the Customer may seek recovery of overpayments from other third parties once the Customer has provided Aetna notice that it will seek such recovery and Aetna has been afforded a reasonable opportunity to recover such amounts.  Aetna has no duty to initiate litigation to pursue any overpayment recovery.

Agreement § 11.

26.     As a fiduciary, Aetna also agreed to be responsible for providing subrogation and

reimbursement services.  Under the Agreement, Aetna was obligated to pursue reimbursement of

monies legally owed to the Plans:

> Aetna has the exclusive discretion to: (a) decide whether to pursue potential
> recoveries on subrogation/reimbursement claims; (b) determine the reasonable
> methods used to pursue recoveries on such claims, except with respect to initiation
> of formal litigation; and (c) decide whether to accept any settlement offer relating
> to a subrogation/reimbursement claim.  Aetna shall advise the Customer if the
> pursuit of recovery requires initiation of formal litigation. In such event, the
> Customer shall have the option to approve or disapprove the initiation of litigation.
> Subrogation /reimbursement services will be delegated to an organization of
> Aetna's choosing.

Medical Services Schedule to the Agreement § VII(8).  Aetna's discretion, however, was not

unbounded.  Rather, it exercised its discretion as an ERISA fiduciary.

27.     Grainger had no role in Aetna's decision to approve or deny claims.  Grainger also

had no role in Aetna's decision to pay any particular amounts for approved claims.  Aetna was

uniquely positioned to make and exercise discretionary authority or control over plan management,

including the right to change unilaterally the value of a fee or rate.  Aetna was further provided

broad flexibility in determining its course of action in administering the Plans.  Grainger relied on

Aetna to process, review, and adjudicate claims for health benefits properly.  Aetna was authorized

to request and receive from the Plans only the amount of money actually paid to providers.

28.     Aetna is an ERISA fiduciary when acting as a TPA.  *See Aramark Services, Inc. et*

*al. v. Aetna Life Ins. Co.*, 23-cv-00446-JRG (E.D. Tex. April 26, 2024) (Dkt. No. 43 at 8

(recognizing Aetna's status as a fiduciary when acting as a third-party claims administrator).

Aetna served in that role for Grainger.  Aetna has also represented to judicial officers in other

proceedings that, when acting as a TPA, Aetna is an ERISA fiduciary.  *See, e.g.*, *Aetna Life Ins.*

*Co. v. Bayona*, 223 F.3d 1030, 1033 (9th Cir. 2000) ("We agree with Aetna that the company

qualifies as a fiduciary for purposes of the statute.  'When an insurance company administers claims for an employee welfare benefit plan and has authority to grant or deny the claims, the company is an ERISA "fiduciary" under 29 U.S.C. § 1002(21)(A)(iii).'"); *In re Omnicom Grp. Inc. ERISA Litig.*, No. 1:20-cv-4141, 2022 WL 18674830, at *15 (S.D.N.Y. Dec. 23, 2022) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271–72 n.8 (2d Cir. 1982)) ("Under ERISA, the duties owed by fiduciaries to plan participants and beneficiaries 'are those of trustees of an express trust—the highest known to the law.'").

29.     As a fiduciary of the Plans, Aetna had and continues to have a fiduciary duty to exercise "care, skill, prudence and diligence" to identify, deny, and prevent the payment of false, fraudulent, or improper provider-submitted claims or other claims that did not satisfy the eligibility and other requirements of the Plans.

30.     As a fiduciary, Aetna was and is prohibited from siphoning funds, effectively undisclosed fees, from the Plans under the false pretenses that it was paying claims while extracting such fees from the funds intended to pay medical services.

31.     Aetna breached its fiduciary duties by approving and paying false, fraudulent, and improper claims and withdrawing undisclosed fees from the Plans' funds to pay those providers that cared for and treated Plan Participants.

32.     Notwithstanding its fiduciary obligations to "aggressively investigat[e] all types of fraud using the latest detection, investigation, and recovery techniques"—which it does for claims under its own, fully-insured plans, as discussed below—Aetna approved and paid with the Plans' assets millions of dollars in claims that never should have been paid. *Aetna Special Investigations Unit*, AETNA 1, 2, https://www.aetnafeds.com/pdf/FraudBrochure.pdf.   In most instances, the wrongfully paid claims were paid automatically, almost immediately, and with no human review.

## AETNA'S WRONGFUL CONDUCT

A.     **Aetna Did Not Give Grainger Its Own Medical Claims Data**

1.     **Administrative Simplification and Standard Transaction Basics**

33.     Federal regulations require that participants in the healthcare system, *e.g.*, providers, health plans, and insurers, exchange information regarding enrollment, eligibility, billing, claim status, adjustments, adjudication, and payment using specifically defined electronic data sets.  Claim processing and payment are governed by the Health Insurance Portability and Accountability Act ("HIPAA") Administrative Simplification regulations.   *See* 45 C.F.R. § 162.920(a).  HIPAA requires "covered entities" to comply with all HIPAA transaction standards, operating rules, and code sets.  *See* 45 C.F.R. §§ 160.103, 162.100.  Aetna is a "covered entity" as that term is defined in Title 45 of the Code of Federal Regulations.  These regulations require that the electronic data sets be used to send and receive the medical claims data in the X12 5010 standard.  The Department of Health and Human Services has adopted the following EDI data set standards by regulation:

34.     *Eligibility and Benefits [270 and 271 transactions].*   "The request transaction, known as the X12 5010 270 transaction for inquiries about eligibility and benefits, . . . can be sent from a health care provider to a health plan, or from one health plan to another[.]  The response transaction, known as the X12 5010 271 transaction for health plan, responds to inquiries about eligibility/benefits[.]"  *See Health Plan Eligibility and Benefits Transaction Basics*, CMS 1, 1, https://www.cms.gov/files/document/health-plan-eligibility-and-benefits-transaction-basics.pdf ("These standards apply to all HIPAA-covered entities—health plan (including Medicare and Medicaid), clearinghouses, and certain health care providers that conduct the adopted transactions electronically—not just those that work with Medicare or Medicaid.").

35.     *Payment / Invoicing / Coordination of Benefits [837 transaction].*  The 837 file is the electronic invoice that the medical provider submits to the insurance company for reimbursement.  The 837 contains information on insurance claims and includes data about the patient's treatments (such as the healthcare services delivered), the cost of medical care, and any modifications.

36.     HHS adopted the X12 837 standard for coordination of benefits ("COB").  This standard applies to all HIPAA-covered entities—health plans, clearinghouses, and providers.  The 837 standard supports two options for conducting COB transactions: either between health plans and other payers, or from health care providers to health plans.  *See Coordination of Benefits Transactions Basics*, CMS 1, 1, https://www.cms.gov/files/document/coordination-benefits-transactions.pdf.

37.     *Claim Status [276 and 277 transactions].*  "The 276 [is] the transaction for provider inquiries about claim status.  The 277 transaction [is] for health plan responses about claim status."  *See Claim Status Basics*, CMS 1, 1, https://www.cms.gov/files/document/claim-status-transactions.pdf.

38.     The 835 is the digital transaction that delivers claim payment details from the insurer to the provider.  The 835, like the 837, contains information such as what medical care is being reimbursed, and for what amount.  If the billed amount has been lowered or altered, the 835 also contains an explanation for any such adjustment.  The 835 also offers insurance details such as deductibles, co-pay amounts, healthcare claim splitting, co-insurers, and bundling.  One of the two standards for EFT transactions is "Accredited Standards Committee X12 Health Care Claim Payment/Remittance Advice (835), Version 005010X221 and its associated Errata Documents [ ], the standard for data content of the CCD+Addenda Record.  The adopted standard for ERA

[Electronic Remittance Advice] transactions is X12 835 V5010." *See EFT and ERA: Electronic Funds Transfer and Electronic Remittance Advice Transactions Basics*, CMS 1, 2, https://www.cms.gov/files/document/electronic-funds-transfer-and-electronic-remittance-advice-transactions.pdf.

39.     As a covered entity, Aetna must comply with the HIPAA regulations.

40.     Consistent with the applicable regulations, Aetna employed the X12 5010 standard transaction data sets when it processed Grainger's employees' medical claims.

41.     In addition to payers, *i.e.*, self-funded health plan and health insurance companies, and providers, "EDI clearinghouses" play a critical role in enabling the electronic transmission of medical claims.  *See United States v UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118, 124 (D.D.C. 2022).  "In 2021, 97 percent of medical claims were submitted electronically, and 95 percent of providers and 99 percent of insurers used EDI clearinghouses" to process those transactions.  *Id.* at 125.  A substantial amount of medical claims data flows through EDI clearinghouses—covering "the entire lifecycle of a claim—both pre- and post-adjudication." *Id.*  "Pre-adjudicated claims data include details about the provider, the patient, the employer group, the location of care, the diagnosis, the services and procedures rendered, and the billed amounts"; "[p]ost-adjudicated claims data [ ] include[s] even more information, such as details about the provider-payer contract, the payer's claims edits, the medical policy and benefit design, the final paid amount, and adjudication decisions." *Id.*

42.     In practice, the medical claim submission and claim process works as follows: After a provider treats a patient, a treatment record is created and a standard billing form—CMS-1500 Health Insurance Claim Form or the UB-04 (CMS-1450) institutional paper claim form—is prepared.  This is essentially a bill, invoice, or claim, prepared by the providers and submitted to

Aetna.  In parallel, the information in these forms is usually translated into a specific, regulation-required ANSI X12 5010 format EDI data, the 837.

43.     Aetna publishes Companion Guides that provide instructions for electronic communications and supplemental information for creating transactions while ensuring compliance with ASC X12 instructions.

44.     Once the billing form or 837 is transmitted to the insurance company, the insurance company must acknowledge receipt within two days.

45.     If Aetna accepts and processes the transaction (claim(s) and incurred charges), then it generates a document known as an "Electronic Remittance Advice" or an "835," which is a record of claims adjudication or adjustment and payment for the submitted claim.  An 835 is not a rejection of the claim.  The 835 is then required to be transmitted to the provider's office and maintained by Aetna in the standard or original format for auditability.

46.     If Aetna rejects a claim, then it does not generate an 835.  Rather, it generates an EDI data record referred to as a "999" and transmits that to the provider's office.  A rejected claim also triggers the creation of a CCD+ Addenda in the amount of $0.00.

47.     When a provider bills Aetna for services or treatment, they follow the industry standard service and treatment codes, including Current Procedural Terminology ("CPT") codes, Diagnostic-Related grouping ("DRG") codes, and International Classification of Diseases ("ICD") codes.

48.     Aetna did not provide Grainger with the standard transaction data sets for the medical claims Aetna processes that are paid by Grainger. *See* 45 C.F.R. §§ 160.103, 162.100, 162.920(a).

**B.      Aetna Breached Its Fiduciary Duties**

49.     Aetna requested and was paid over $153 million dollars from Grainger to pay medical claims from 2020 through 2022.

50.     Grainger paid Aetna to police its claims.  Aetna did not do so.  Incomplete medical claims data for claims processed over a twenty-seven-month period demonstrate that Aetna overpaid Grainger's Plan Participants' claims by millions of dollars as a result of its failure to protect against abusive billing practices, payment errors, impossible pricing outliers, and non-covered services.  These practices are discussed below.

**1.      Aetna Caused Grainger to Pay Thousands of Improper, False, or Fraudulent Claims**

51.     Aetna approved more than 2,000 claims that exhibit abusive billing practices.  This includes (a) claims with duplicate payments for the same services to the same provider for the same member; (b) submissions of claims that were untimely; (c) abusive drug testing; (d) COVID-19 testing abuse; and (e) errors in surgery claims.  Upon information and belief, and based on the limited data available to Grainger at the time of filing this Complaint, Grainger overpaid these claims by more than 44%.

52.     Included in these claims, Aetna approved more than 200 claims containing clear surgical session errors.  During surgical sessions, both the surgeon performing the service and the facility where the surgery occurred are allowed reimbursement for their respective role in the surgery.  The surgery codes that the hospital bills are expected to match the codes that the surgeon bills.  Yet that does not always happen, and it is Aetna's responsibility as TPA to identify those instances where the bills are not consistent.  For example, Overlake Hospital Medical Center billed for the surgical removal of a lymph node and lymph channels in addition to billing for the surgery performed that matched the surgeon's bill.  Overlake Hospital Medical Center also billed for

14

additional surgery codes with a higher charge rate adjustment than the surgeon's.  Despite not matching the surgeon's bill, Aetna approved Overlake Hospital Medical Center's charges resulting in an overpayment of $8,610.

53.     Aetna paid over 500 fraudulent or improper claims for drug tests and COVID-19 tests without review and almost immediately after they were submitted.  Aetna approved expensive COVID-19 test billing codes intended to be specific to hospital outpatient clinics, even when the submitting facility was an inpatient detox facility—further indicating that Aetna did not review these claims prior to payment.

54.     Aetna's failure to police these abusive claims resulted in Grainger being substantially overbilled.  More troubling, Aetna used Grainger funds to pay the vast majority of these claims automatically, often within days, without any review by Aetna.  Upon information and belief, many of these claims are associated with particular providers with whom Aetna has explicit or informal agreements not to scrutinize their claims or to scrutinize only a limited number of the claims they submit to Aetna.

### 2.     Aetna Approved Payment of Dummy Codes to Pay Subcontractors

55.     The Agreement permitted Aetna to use subcontractors or other contracted parties to provide the required services.  The Agreement, however, did not permit Aetna to bill Grainger for additional or incremental fees associated with the services provided by those subcontractors or other contracted parties.  Aetna has a history of using "dummy" codes to pay subcontractor fees from the medical claims fee flow.  *See e.g.*, *Peters v. Aetna, Inc.*, No. 1:15-cv-00109-MR, 2023 WL 3829407, at *3, *14 (W.D.N.C. June 5, 2023) (certifying class where Aetna's subcontractor arrangement allowed for charging a fee greater than allowed by the plan contract and served to hide the excess fees from the plan and members by misidentifying these fees as part of a claim for services).  Grainger's investigation is not complete, but the incomplete medical claims data shows

that Aetna paid with Grainger funds claims with improbable, nonsense, undefined, or gibberish codes, like the ones used to compensate subcontractors in violation of Aetna's fiduciary obligations.

### 3.    Aetna Caused Grainger to Pay for Rehabilitation Center Abuse

56.    Upon information and belief, Grainger was the victim of a number of instances of a well-known fraudulent billing scheme known as the "Rehab Riviera," that Aetna should have caught, and would have caught had it been financially responsible for the payments, but did not. To execute this scheme, unscrupulous operators of high-end rehabilitation facilities recruit or have agents recruit people with addiction issues and good health insurance to engage the services of various in-patient rehabilitation centers and sober living houses so that the facilities can repeatedly bill the patient's insurance company.   The care provided at these locations is rarely effective because it relies upon a returning patient or a patient repeatedly rotated through loosely affiliated rehabilitation centers.   In other words, for the scheme to work, the "rehabilitation" for which Grainger paid is designed to be ineffective.

57.    The Orange County Register described the "scheme" as follows:

Patient recruiters typically receive payment from the rehab centers for each patient that generates revenue.   Predatory marketing practices often involve a misrepresentation of the services and the auctioning of patients through clearinghouses.   The clearinghouses route the patients to call centers, and once the patient's insurance is verified, the clearing centers act as brokers auctioning off the patients to the highest bidding rehab centers. . . .   Rehab operators have told to the Southern California News Group that they know it's wrong to offer money to middlemen in exchange for well-insured patients, but that the practice is so ubiquitous in California they'd have no patients at all if they stuck to the high ground. . . .   Addicts start to see their insurance cards as credit cards, operators said, demanding better food, cell phones, even cash from providers in exchange for

staying in treatment.  If the provider doesn't deliver, the addict bolts to a different treatment center that will give him what he wants."[4]

58.     Upon information and belief, Aetna failed to identify the described fraudulent billing practices to the detriment of Grainger and caused Grainger to over-pay for these services.

### 4.     Aetna Caused Grainger to Pay Thousands of Excessive, Inflated, and Unjustifiable Claims

59.     Between June 2020 and December 2022, Aetna also approved nearly 2,000 claims with facially faulty pricing.  These include instances where the claim (a) was greater than the billed amount; (b) had inexplicably high prices for facility services; (c) was paid to in-network providers over five times Medicare standard pricing and otherwise inconsistent with the Plans; (d) had surgical assistants paid at higher rates than primary surgeons; and (e) had extreme pricing variation relative to the amount the provider was regularly paid for the same services.  Aetna's failure to police these claims cost Grainger millions.

60.     Aetna caused Grainger to pay high dollar value claims without adequate review, or any review at all.  For example, Woman's Hospital of Texas submitted a $90,000 claim to Aetna for the treatment and care of a Grainger employee.  Aetna approved and paid the claim within fourteen days of receipt.  Aetna could not have received, properly adjudicated, and paid the itemized hospital invoice within that period.  Failure to review adequately and its blind payment violate Aetna's fiduciary obligations.

---

[4] *Rehab Patient Brokering is Rampant, but It's Hard to Stop, Industry Says*, ORANGE CNTY. REG. (May 30, 2017), https://www.ocregister.com/2017/05/30/rehab-riviera-in-addiction-industry-even-simple-fixes-are-hard/; *How Many Body Brokering Cases Have Been Prosecuted by the Feds Under New Law?*, ORANGE CNTY. REG. (Mar. 12, 2020), https://www.ocregister.com/2020/03/12/how-many-body-brokering-cases-have-been-prosecuted-by-the-feds-under-new-law/.

### 5. Aetna Caused Grainger to Pay for Uncovered Claims

61. During the same period, Aetna approved no fewer than 1,800 claims for services that were not covered by the Plans.  The Plans do not cover every potential medical service or procedure.  Not only was Aetna aware of these exclusions, Aetna assisted Grainger in preparing the documents that identify treatments or procedures excluded from medical insurance coverage.  Such exclusions include cosmetic surgery, non-FDA approved or experimental treatments, vitamins, supplements, and over-the-counter medicine.  By way of example, Texas Health Center for Diagnostics billed the Plans for a non-covered cosmetic surgery after bariatric surgery, specifically a tummy tuck.  Texas Health Center justified the surgery as addressing panniculitis—inflammation of the bottom layers of the skin—but the patient had no prior diagnosis of, treatment for, or medical history regarding panniculitis before the surgery.  Aetna approved the charges for the surgery, resulting in the Plans paying more than $30,000 for a non-covered cosmetic surgery.

62. Grainger also found instances where Aetna approved inappropriately high facilities fees for telehealth services where the facility incurs minimal to no cost.  In one example, Aetna approved payment of more than $100,000 in unidentified and unclassified drugs within a claim for telehealth services.

### 6. Aetna Caused Grainger to Pay for Thousands of Impossible Claims

63. Even based on the limited information available to it today, Grainger found millions in payment errors during the period of June 2020 to December 2022, including medically unlikely edits and other errors.  Many of the claims Aetna approved without review are medically unlikely, a euphemism for medically impossible.

### 7. Aetna Has Failed to Provide Subrogation Services

64. Aetna also agreed to provide subrogation services.  A claim is subject to "subrogation" when another party, besides Grainger, is responsible to pay for the medical services

provided.  In the case of a car accident, the responsible auto insurance company should pay, not Grainger.  If the patient was treated for an "on-the-job" injury, then the responsible worker's compensation fund should pay for the care, not Grainger.

65.     As one example, University Health System billed for extended treatment during a hospital stay resulting from a motorcycle accident.  The applicable auto insurance company has primary responsibility to pay for these services.  Aetna nonetheless approved the claim and does not appear to have pursued subrogation.  The Plan is therefore entitled to recover for the full payment of $143,942 on this claim.

### 8.     Aetna Caused Grainger to Pay for Hundreds of Emergency Room "Super Users" Without Notifying Grainger

66.     Aetna regularly paid claims for emergency room ("ER") visits that were improper and abusive.  ER overutilization and up-coding are increasing trends among health care services. For example, a high-level office visit costs $200 in comparison to an approximately $3,000 non-emergency ER visit.  Studies have shown that a small percentage of "superusers"—members that have more than five ER visits in a year—tend to drive these costs and even a small improvement in shifting habitual ER users to providers' offices or urgent care centers would result in substantial cost reductions for Grainger.  Between June 2020 and December 2022, the limited claims data identified the most commonly billed procedure code in the facility setting for a Grainger plan member was for an emergency room visit.

### C.     Aetna Engaged in Post-Adjudication Adjustments Which Harmed Grainger

### 1.     Aetna Engaged in Cross-Plan Offsetting

67.     Aetna engaged in cross-plan offsetting while serving as TPA for Grainger to the detriment of Grainger.

68.     Cross-plan offsetting often benefitted Aetna, specifically its own fully insured plans, at the expense of self-funded plans, like the Plans.

69.     To cross-plan offset, Aetna overpaid a provider using funds from the Plans.  Rather than collect the overpayment back from the provider, Aetna simply deducted the overpaid amount from the next payment to the provider.  Often, however, the "next" reduced payment came from a different plan such that the reduced amount of the "next" payment did not benefit the Plans.  Instead, that "next" payment came from either another self-funded plan or, frequently, one of Aetna's fully insured plans.  So, another self-funded plan or—in most cases—*Aetna itself* received the benefit of the reduced payment amount.

70.     For example, Doctor X treats a patient covered by the Plans.  Doctor X submits a claim for payment to Aetna in the amount of $1,000.  Aetna reviews the claim and pays Doctor X $1,000 for the service.  Aetna later decides that it should have paid Doctor X $600.  Aetna does not ask Doctor X for a refund.  Rather, Aetna waits until Doctor X treats another patient covered by an Aetna fully insured plan—rather than the Plans.  Doctor X submits a claim for payment to Aetna for $1,000 for treating a second patient.  Aetna reviews the claim and decides Doctor X should be paid $600.  Rather than paying Doctor X $600 for treating the second patient, Aetna deducts the $400 overpayment on the first patient and pays Doctor X $200 for the second patient.  Aetna never refunded or credited the Plans the $400 that Aetna initially overpaid for treating the first patient in this example.  Aetna used cross-plan offsetting to get Grainger's self-funded Plans to illicitly subsidize its fully insured book of business.

71.     Aetna benefitted from cross-plan offsetting to the detriment of the Plans, in breach of Aetna's fiduciary obligations to the Plans.  Aetna's practice of cross-plan offsetting has already been held to be unlawful and a violation of ERISA.  *See Lutz Surgical Partners PLLC et al. v.*

*Aetna, Inc. et al.*, No. 3:15-cv-02595 (BRM)(TJB), 2021 WL 2549343, at *15–18 (D.N.J. June 21, 2021) (concluding "Aetna's cross-plan offsetting is prohibited by ERISA"), *vacated*, 2023 WL 2472403 (D.N.J. Feb. 8, 2023).

### 2. Aetna Reprocessed Claims to the Detriment of Grainger

72. On information and belief, Aetna took funds from the Plans in an amount close to the provider-billed amount or the amount the provider was owed pursuant to an in-network agreement. Then, Aetna frequently reprocessed the claims. It did this for one reason: to adjudicate the claims at an amount lower than the amount taken from the Plans.

73. As a result of the reprocessing, Aetna used the lower, reprocessed amount to justify paying the provider less than the billed amount or the amount Aetna otherwise would be contractually required to pay the provider.

74. By reprocessing a claim, Aetna obtained negotiating leverage over the provider because this practice, whether justified or not, resulted in substantial delay of any payments to the provider.

75. It is not uncommon for Aetna to "reprocess" claims multiple times. As part of its reprocessing, Aetna frequently altered the claim number so that the claim could not be tracked accurately or traced as required by the applicable regulations. For example, Aetna's convention is to process (and reprocess) claims electronically. Such processed and reprocessed claims have an "E" prefix or leading character. If Aetna is not able to extract the agreement or concession from the provider to take a reduced rate for the claim, then Aetna replaces the "E" prefix or leading character of the claim identification number with a "P"—presumably for "paper"—and reprocesses the claim as a "paper" claim. This practice disconnects the original electronic claim from the "paper" claim and interferes with the tracing or audit trail associated with the original

claim.  Eventually, either Aetna does not pay the reprocessed claim or it pays the reprocessed claim at a significantly reduced rate.

76.     Aetna never refunded or credited to the Plans the difference between the amount removed from the Plans' accounts and the amount ultimately paid to the provider pursuant to the reprocessed claims.

77.     Aetna's retention of that difference violated its obligations as a fiduciary under ERISA.

### 3.    Aetna Took More from the Plans Than It Paid Out-of-Network Providers

78.     Aetna obtained undisclosed fees from the Plans under false pretenses.  When Aetna received a claim from an out-of-network provider, it frequently engaged a "repricing" company or companies to negotiate a lower amount that Aetna ultimately paid the providers.  On information and belief, Aetna used Zelis Healthcare Corp., MultiPlan Corp., and Global Claims Services.  Global Claims Services is owned by Aetna, has common ownership with Aetna, or is affiliated with Aetna more closely than through an arms-length contractual arrangement.

79.     The providers want to be paid—and should be paid their fair amount—for treating Grainger employees and their families.  Aetna wants to pay the providers as little as possible.  The repricing companies have one job: to delay payment until the provider's biller relents and agrees to accept an amount well below the billed amount and well below what Aetna wrongfully obtained from the Plans.  If one repricing company is not making headway with a provider, then Aetna shifted the claim to another repricing company, and then another, and then another.  Aetna did not disclose to Grainger that the repricing companies are subcontractors or that they are engaged in the claim adjudication and provider payment process.

80.     Aetna's use of repricing companies confirms its practice of taking more funds from the Plans than it paid to providers.  Aetna's agreements with the repricing companies require it to pay them a percentage of the amount they "save," *i.e.*, a bounty.  Aetna paid the repricing companies from the excess funds it wrongfully obtained from the Plans.  Aetna did not pay the repricing companies their "bounty" from its monthly per-employee fee.  Rather, Aetna extracted the "fee" for the repricing companies from the amounts it obtained from Grainger to pay provider medical claims.

81.     On information and belief, management and representatives of the repricing companies are aware that Aetna acted as the Plans' TPA.  Management and representatives of the repricing companies are aware that Aetna paid its "bounty" or "success fee" from an Aetna account or accounts containing funds from the Plans.  Management and representatives of the repricing companies are aware that Aetna obtained money from the Plans before it knew how much a provider would ultimately be paid.  Management and representatives of the repricing companies are aware that Aetna did not refund, credit, or offset to the Plans amounts that the repricing companies saved.

**D.     In Direct Violation of ERISA, Aetna Commingled Plan Funds with Its Own Funds**

82.     For many of these schemes to work, Aetna moved funds from the Plans' accounts into Aetna's own account containing Aetna's funds and the funds of other plans.  Because Aetna is an ERISA fiduciary, such commingling is not permitted.

83.     As a TPA and an ERISA fiduciary, Aetna was supposed to make payments from an account owned and controlled by the Plans.  Aetna was supposed to write checks from or make ACH transfers from the Plans' accounts to a doctor or hospital that cared for a beneficiary of one of the Plans.

84.     In practice, that did not happen.   Aetna obscured recipients of payments and payment amounts by directing the Plans to fund their accounts in certain bulk and undifferentiated amounts.   Aetna transferred funds from the Plans' accounts not to providers, but to an account or accounts owned and controlled by Aetna or one of its affiliates.   Aetna then made payments to providers from the Aetna account or accounts.   The Plans have no access to these accounts, so they do not know—and have no way to determine—exactly how much the providers receive for specific claims and whether that matches the amounts the Plans transferred to Aetna for those specific claims.

### E.     Aetna Applied Less Rigorous Claims Adjudication Standards to Self-Funded Plan Claims Than It Applies When Adjudicating Claims for Its Own Fully Funded Plans

85.     As an ERISA fiduciary, Aetna is required to treat claims submitted to the Plans as it treats claims submitted to its fully insured plans.   Aetna did not do this.   Aetna applies rigorous standards for accepting, processing, and paying claims submitted to its fully insured plans where Aetna is paying claims with its own money.   As a result of applying these rigorous standards, Aetna has a high rejection rate for claims submitted to its fully funded plans for payment.

86.     Aetna proudly declares in fraud resources available online that it takes a "zero-tolerance approach to fraud."   Aetna even has an entire section of its website dedicated to "Fraud and Abuse."   According to Aetna, estimated financial losses caused by insurance fraud "run in the tens of billions of dollars each year."   *Aetna Special Investigations Unit*, AETNA 1, 2, https://www.aetnafeds.com/pdf/FraudBrochure.pdf.

87.     Aetna claims to "lead the fight against fraud" through its "Special Investigations Unit," which is dedicated to "aggressively investigating all types of fraud using the latest detection, investigation and recovery techniques."   Aetna claims that "[w]hether taking on large health care management companies or individual providers, we work to protect you."   According to Aetna, its

Special Investigations Unit "saves and recovers hundreds of millions of dollars related to fraud, waste, and abuse."  Aetna states that customers can "count on us to fight for you and everyone affected by fraud, day in, day out."  *Id.*

88.     Aetna asserts that "reliable fraud detection relies heavily on technology" and its Special Investigations Unit "goes a step beyond with dedicated IT staff and [its] own systems capability" in order to "gather a huge volume of claims data all in one spot."  This way, Aetna claims, it can "use advanced software to comb through massive amounts of data" then "identify providers whose claims appear unusual or inconsistent with their peers.'"  *Id.*

89.     Examples of "red flags" Aetna claims it investigates to catch provider fraud include: "unusual provider billing practices;" "billing patterns that are inconsistent with those of peers;" "discrepancies between billed services and patient records;" "unusually high volume or percentage of same services;" "pressure to pay claims quickly;" and "provider advertisements for 'free' services or other incentives."  *Id.* at 3.  As explained in detail above, those are the exact type of claims for which Aetna has approved payment from the Plans.

90.     When Aetna is not responsible for paying claims with its own money, and instead pays claims with money from self-funded plans, like the Plans, Aetna applies far less rigorous standards for accepting, processing, and paying claims submitted for payment.  On information and belief, as a result the claim rejection rate for a self-funded plan generally, and the Plans specifically, is lower than the rate for Aetna's fully insured plans.

91.     By prioritizing its own assets and resources to the detriment of the Plans, Aetna breached its fiduciary duty to the Plans.

92.     Moreover, as part of the Agreement, Aetna has committed to recover overpayments; to make recoveries for subrogation and coordination of benefits; and to police

fraud, waste, and abuse for the benefit of the Plans.  Aetna even has specific departments devoted to these activities.

93.      Aetna did not apply the above-described fraud prevention investigations, techniques, and technology to identify and prevent the payment of fraudulent or otherwise improper claims made to the Plans, or did not apply those fraud prevention investigations, techniques, and technology as stringently as they did with claims made to Aetna's own insurance plans.

94.      Aetna's failure to employ these fraud prevention investigations, techniques, and technology adequately, or do so as stringently as it does with claims made to its own insurance plans, violated its fiduciary duty to "process claims for Plan benefits incurred on or after the Effective Date using Aetna's normal claim determination, payment and audit procedures and applicable cost control standards . . . ."

**F.     Aetna Used Exclusion Lists as a Means to Limit the Scrutiny Applied to Grainger's Claims**

95.      Aetna employs a tactic, strategy, or procedure that involves "exclusion lists."  To induce providers to join Aetna's network of providers and enter "in-network" agreements, and perhaps for other reasons, Aetna agrees to place providers on "exclusion lists."  A provider on this list benefits because being on this list commits Aetna to providing no scrutiny or limited scrutiny to the claims those providers submit for reimbursement.  Or, it commits Aetna to scrutinize and properly adjudicate only a small number or a small percentage of the claims the listed providers submit for adjudication.

96.      Discovery will show that Aetna used exclusion lists and consequently applied limited scrutiny to certain claims for which Grainger ultimately paid.  Even the incomplete claims

data shows that Aetna regularly processed claims from specific providers quickly, with no review, and with minimal revisions or adjustments, if any, to the amounts the provider billed.

97.     At no point did Aetna disclose the use of exclusion lists to Grainger.  Nor did it disclose that claims for payment submitted to Aetna related to the care and treatment of Grainger employees would not be reviewed or scrutinized.

## CLAIM ONE

### Breach of Fiduciary Duty under ERISA
### (29 U.S.C. §§ 1104(a) and 1109(a))

98.     Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

99.     Plaintiffs bring this Claim under 29 U.S.C. §§ 1132(a)(2), (a)(3), 1104(a), and 1109(a).  Plaintiffs have standing to bring this Claim under these provisions as ERISA fiduciaries.

100.     As the claims administrator to the Plans, Aetna is an ERISA fiduciary and thus owed the Plan Participants and Grainger a fiduciary duty to discharge its obligations to the Plans "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).

101.     Aetna also owed a separate and independent fiduciary duty to discharge its obligations in accordance with the terms of the Plans' documents.  *See* 29 U.S.C. § 1104(a)(1)(D).

102.     Aetna breached its fiduciary duties as set forth herein.

103.     Aetna further breached its fiduciary duties by approving claims for benefits that contained indicia of fraud without first determining (either through an investigation or otherwise) that the claims were legitimate, non-fraudulent and covered by the Plans.

104.    Aetna further breached its fiduciary duty by not recovering from providers amounts paid pursuant to fraudulent or otherwise improper claims.

105.    Aetna's breach of its fiduciary duty resulted in improper payments of fraudulent or otherwise improper claims by Grainger.  These losses were ultimately suffered by Plaintiffs.

106.    Aetna has profited an undetermined amount due to its breach of its fiduciary duties.

107.    Accordingly, Plaintiffs seek (i) the recovery of any and all losses resulting from Aetna's breach of its fiduciary duty; (ii) the recovery of any and all benefit or profits Aetna made as a result of its breach of its fiduciary duty; (iii) all such other equitable or remedial relief as may be appropriate; and (iv) the recovery of Plaintiffs' attorneys' fees and costs.

## CLAIM TWO

### Prohibited Transactions Under ERISA
### (29 U.S.C. §§ 1106(a)(1)(D) and 1109(a))

108.    Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

109.    Plaintiffs bring this Claim under 29 U.S.C. §§ 1132(a)(2), (a)(3), 1106(a)(1)(D), and 1109(a).  Plaintiffs have standing to bring this Claim under these provisions as ERISA fiduciaries.

110.    Aetna is an ERISA fiduciary.

111.    The health care providers and other parties to whom Aetna made payments pursuant to claims for health benefits that it approved are "parties in interest" under ERISA because they provided or purported to provide "services" to the Plans.

112.    By approving and paying fraudulent or otherwise improper or uncovered claims to such parties in interest, Aetna engaged in "prohibited transactions" by causing the Plans to engage

in transactions that Aetna either knew or should have known constitute a direct or indirect transfer to or use by or for the benefit of a party in interest of assets of the Plans.

113.    Grainger did not receive adequate consideration for the amounts that were paid for these prohibited transactions.

114.    In addition, Aetna retained for itself and transferred to itself monies from the Plans to which it had no lawful right.  Aetna further transferred some portion of the Plans' money, that was wrongfully retained or obtained, to its affiliates, to its subcontractors, and to other third parties as compensation for their participation in the scheme, pattern and practices employed by Aetna to obtain and retain monies from the Plans to which it had no lawful right.

115.    Accordingly, Plaintiffs seek (i) the recovery of any and all losses resulting from Aetna having engaged in prohibited transactions; (ii) the recovery of any and all benefit or profits Aetna made as a result of having engaged in prohibited transactions; (iii) all such other equitable or remedial relief as may be appropriate; and (iv) the recovery of Plaintiffs' attorneys' fees and costs.

### CLAIM THREE

### Breach of Fiduciary Duty Under ERISA
### (29 U.S.C. §§ 1106(b)(1) and 1109(a))

116.    Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

117.    Plaintiffs bring this Claim under 29 U.S.C. §§ 1132(a)(2), (a)(3), 1106(b)(1), and 1109(a).  Plaintiffs have standing to bring this Claim under these provisions because they are ERISA fiduciaries.

118.    As claims administrator for the Plans, Aetna is a fiduciary under ERISA, and thus owed fiduciary duties to Grainger.  ERISA forbids a fiduciary from engaging in self-dealing.  *See* 29 U.S.C. § 1106(b)(1).

119.    Aetna controlled the adjudication, pricing, repricing, reprocessing, and payment of health care provider claims through an adjudication process.

120.    As a fiduciary, Aetna was required, among other things, to discharge its duties solely in the interest of the participants and beneficiaries of the Plans, to preserve the Plans' assets, and to disclose fully its actions and any compensation it was taking for its services.

121.    As set forth herein, Aetna breached its fiduciary duties by engaging in a variety of wrongful acts and practices.

122.    Additionally, Aetna made profits of an undetermined amount due to its breach of its duty of loyalty and care.

123.    Accordingly, Plaintiffs seek (i) the recovery of any and all losses resulting from Aetna's breach of its fiduciary duty; (ii) the recovery of any and all profits or benefit that Aetna made as a result of its breach of its fiduciary duty; (iii) all such other equitable or remedial relief as may be appropriate; and (iv) the recovery of Plaintiffs' attorneys' fees and costs.

## CLAIM FOUR

### Prohibited Transactions Under ERISA
### (29 U.S.C. §§ 1106(b)(3) and 1109(a))

124.    Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

125.    Plaintiffs bring this Claim under 29 U.S.C. §§ 1132(a)(2), (a)(3) and 1109(a). Plaintiffs have standing to bring this Claim under these provisions as ERISA fiduciaries.

126.   As claims administrator for the Plans with discretion over the Plans' administration and the Plans' assets, Aetna is a fiduciary under ERISA.  As a fiduciary, Aetna was prohibited from "receiving any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the plan."  *See* 29 U.S.C. § 1106(b)(3).

127.   By retaining the difference between the negotiated price for medical services rendered and the monies withdrawn from the Plans, and collecting "savings" and "reprocessing" fees, Aetna received consideration from parties transacting with the Plans constituting "prohibited transactions."  Among other things, Aetna used its control of the assets of the Plans, the negotiation of the price paid for medical services, and the engagement of "repricing" companies to improperly receive and retain monies from the Plans.

128.   Aetna retained for itself and transferred to itself monies from the Plans to which it had no lawful right.

129.   Grainger did not receive adequate consideration for the amounts that were paid for these prohibited transactions.

130.   Accordingly, Plaintiffs seek (i) the recovery of any and all losses resulting from Aetna having engaged in prohibited transactions; (ii) the recovery of any and all profits that Aetna made as a result of having engaged in prohibited transactions; (iii) all such other equitable or remedial relief as the court may deem appropriate; and (iv) the recovery of Plaintiffs' attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court issue a final judgment:

a.   ordering Defendant to reimburse Plaintiffs for any and all losses resulting from Defendant breaching its fiduciary duties and/or having engaged in prohibited transactions;

31

b.      ordering Defendant to disgorge to Plaintiffs any and all profits that Defendant made as a result of its breaches of fiduciary duties and/or having engaged in prohibited transactions;

c.      issuing a preliminary injunction compelling Defendant to provide all Plan claims data (subject to appropriate privacy protections);

d.      granting all such other equitable or remedial relief as the Court may deem appropriate; and

e.    ordering Defendant to pay Plaintiffs their attorneys' fees and costs.

Dated: May 10, 2024

*/s/ Jennifer Truelove*
Jennifer Truelove
Texas Bar No. 24012906
MCKOOL SMITH, P.C.
jtruelove@mckoolsmith.com
104 East Houston Street, Suite 300
Marshall, TX 75670
Telephone: 903-923-9000
Telecopier: 903-923-9099

Jon Corey
D.C. Bar No. 491311
jcorey@mckoolsmith.com
MCKOOL SMITH, PC
1999 K Street NW, Suite 600
Washington, DC 20006
Telephone: (202) 370-8300
Facsimile: (202) 370-8344

David I. Schiefelbein
New York State Bar No. 4767398
dschiefelbein@mckoolsmith.com
Emily B. Tate
New York State Bar No. 5769153
etate@mckoolsmith.com
MCKOOL SMITH, PC
1301 Avenue of the Americas, 32nd Floor
New York, NY 10001
Telephone: (212) 402-9400
Facsimile: (212) 402-9444

**Attorneys for Plaintiffs**
*W.W. Grainger, Inc.; W.W. Grainger, Inc. Group Benefit Plan I; W.W. Grainger, Inc. Group Benefit Plan II; and W.W. Grainger, Inc. Group Benefit Plan III*

33